IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PARTICIA ANN MCNEAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 15-CV-289-JED-JFJ |
| v. | ) |
| | ) |
| METROPOLITAN LIFE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff, Patricia Ann McNeal, brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. § 1001 *et seq.*, to recover benefits under an employee benefit plan, and to recover costs and attorney's fees as provided by ERISA. McNeal claims that the defendant, Metropolitan Life Insurance Company (MetLife), improperly denied her long-term disability benefits.

**I.    Background**

*Employment as a Clinician*

The following facts are undisputed by record evidence, except where noted. McNeal began working for Alternative Opportunities, Inc. (Alternative) at its DaySpring Behavioral Health Services location in Tulsa, Oklahoma in October 2008. In January 2014, she fell and injured her left knee. At the time of McNeal's knee injury, she was a Master's Degree Clinician. (Administrative Record [AR] 0538).[1]  Alternative's job description summarizes McNeal's occupation as "[p]rovid[ing] clinical services for the improvement and psychological functioning

---

[1]    The Administrative Record is located at Doc. 19-1, 19-2.

of persons served." (AR 0547). The "Essential Duties and Responsibilities" of her job included "[p]rovid[ing] professional clinical services to AO DaySpring participants [sic] clients including assessment, referral, treatment planning, counseling, and discharge planning, [c]omplet[ing] all clinical and administrative documentation, . . . [a]ttend[ing] professional staffing," and other duties. (*Id.*).

### *Disability Coverage*

Alternative provided short-term disability (STD) and long-term disability (LTD) insurance coverage to its eligible employees. (AR 0538, 0437-49). Pursuant to the group LTD insurance policy (the Plan), claims for LTD benefits were administered, and benefits due under the Plan were paid, by MetLife. (*See* AR 0599). Alternative was the Employer and Plan Administrator as defined under the Plan. Under the Plan, "disabled" or "disability" were defined as follows:

> **Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:
>
> - You are receiving Appropriate Care and Treatment determined by Your Physician as necessary to treat the Sickness or injury;
>
> - Complying with the requirements of such treatment; and
>
> - You are unable to earn:
>
> - during the first 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation for any employer in Your Local Economy; and
>
> - after such period, more than 80% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

(AR 0569, 0628). "Own Occupation" is defined by the Plan as "the essential functions You regularly perform that provide Your primary source of earned income." (AR 0570, 0629).

2

According to the policy, MetLife must receive Proof of Disability in order to review and approve a LTD claim. (AR 0578, 0637). As defined in the policy, "Proof means Written evidence satisfactory to [MetLife] that a person has satisfied the conditions and requirements for any benefit described in this certificate," and "[w]hen a claim is made for any benefit . . . , Proof must establish:

- the nature and extent of the loss or condition;
- [MetLife's] obligation to pay the claim; and
- the claimant's right to receive payment."

(AR 0572).

*STD Benefits*

On February 27, 2014, McNeal underwent a total left knee arthroplasty. She applied for STD benefits under the MetLife policy. MetLife found it reasonable that McNeal was unable to perform any of her job functions while recovering from knee replacement surgery. (AR 0007-10). MetLife notified McNeal that her short-term benefits had been approved for the 8-week period of February 27, 2014 through April 23, 2014, and informed her that additional medical information would be necessary for MetLife to consider benefits beyond April 23. (AR 0007, 0530-34).

On April 18, 2014, MetLife received a Supplementary Attending Physician Statement (SAP) from Ryan Gursky, D.O., reporting that McNeal's diagnosis was left knee degenerative joint disease, she was prescribed Percocet and Norco, and indicating that plaintiff would be "continuously unable to perform required job duties from 02-27-14 – May 22, 2014." (AR 0527). Dr. Gursky noted that McNeal was at that time "unable to bend, squat, lift, stand, [or] twist." (*Id.*). McNeal's treatment plan was to continue physical therapy and "follow up in office 4-28-14." (*Id.*). On April 22, 2014, MetLife notified McNeal that her STD benefits had been extended through May 22, 2014. (AR 0013, 0519).

Additional information from Dr. Gursky, dated May 15, 2015, indicated that plaintiff had the following "restrictions to work or activity": "Patient still recovering from surgery; and working on strength & mobility; unable to squat, bend, kneel." (AR 0517). McNeal's physician did not explain why the inability to squat, bend, or kneel would prevent her from performing her counseling duties.

On May 21, 2014, a MetLife STD claim specialist explained to McNeal that, in view of her light job and the normal recovery time for knee replacement surgery, in order to extend her STD benefits, MetLife required detailed medical reasoning, restrictions, and limitations relevant to McNeal's functional job requirements. (AR 0018). On May 22, MetLife wrote to Dr. Gursky:

> This letter is in regard to your patient, Patricia McNeal's Short Term Disability claim. We recently received an Attending Physician's Statement form from you that was not completely filled out. Ms. McNeal had Total Knee Replacement on 2/27, and has now had 12 weeks to recover. In order for the claim to be extended further we need to know what current restrictions are preventing Ms. McNeal from being able to perform the physical duties of her job as a Clinician, which are defined by her employer below:
>
> "While performing the duties of this job, the employee is regularly required to talk and hear. The employee frequently is required to use hands to finger, handle or feel. The employee is occasionally required to stand, walk, and sit. The employee must occasionally list [sic] and/or move up to 10 pounds. Specific vision abilities required by this job include close vision, and ability to adjust focus."
>
> **We will also need to know the current treatment plan that is in place to address those restrictions/limitations, if there are any accommodations that can be made to assist the patient in returning to work, and an estimated date that the patient will be able to return to work without restrictions or the next date that her ability to return to work will be re-evaluated.**

(AR 0512) (emphasis in original).

On May 27, 2014, MetLife received documents from Dr. Gursky's office. (AR 505-511). These included notes from McNeal's follow-up visits on March 11 and March 31, 2014 with a Physician's Assistant, Michael D. Thompson. The notes reported that McNeal was "doing well"

with "[n]o complaints," her "wounds [were] well healed," there were "[n]o signs of infection," she had a "[f]ull range of motion in extension," and "100 degrees of flexion." (AR 0508-509). The PA's March 11, 2014 office notes further indicated that the X-ray findings showed the knee implant was "in stable position," with "no signs of periprosthetic loosening or injury," and the treatment plan was to start physical therapy and follow up in three weeks. (AR 0509).

On March 31, 2014, PA Thompson reported that McNeal had 0 to 110 degrees of motion in the knee. The treatment plan was to continue physical therapy, and follow up in four weeks. (AR 0508). The documents also included Thompson's office notes from a visit on April 28, 2014, in which Thompson reiterated the conclusions of the previous three post-op reports and concluded that there was a "[f]ull range of motion in flexion and extension" of the knee. (AR 0507). Thompson also provided a short summary statement, without further explanation, of opinion that McNeal should "be released from work due to surgery [and] she may return to work after next appointment (7/28/14)." (AR 0506).

McNeal's physical therapist report, dated April 9, 2014, was also provided. It revealed that McNeal had been discharged from further therapy that day. (*See* AR 0510). The physical therapist reported that McNeal had done an excellent job post-operation, she was not using a cane, and goals had been met or exceeded, with only slight left knee edema. (*Id.*).

Based on the information provided, MetLife decided that McNeal's STD benefits were not medically supported beyond April 28, 2014. (AR 0025). By letter dated June 3, 2014, MetLife notified McNeal that her STD benefits would terminate effective May 22, 2014:

> MetLife's decision to terminate benefits is based on a review of all the documentation in your file. According to your job description, you are employed with Alternative Opportunities as a Masters Degree Clinician which requires you to frequently use hands to finger to feel, and occasionally stand, walk, sit, and lift and/or move up to 10 lbs. Per the medical records provided by your doctor on May 27, 2014, as of April 28, 2014, you had full range of motion, proper placement of

5

the implant on X-ray, and your incision was well-healed. Your medical status indicates that you are able to perform the physical requirements of your job, and an extension of your Short Term Disability benefits beyond the current claim end date is not medically supported.

(AR 0503).

### *McNeal's Appeal of STD Termination*

On June 26, 2014, McNeal appealed the termination of her STD benefits, and informed MetLife that she "was seen at Saint Francis Hospital on 6/26/2014 due to the amount of swelling in [her] leg" and she "continue[d] to have an enormous amount of pain that continue [sic] to keep [her] from returning to work." (AR 500). She further informed MetLife that she had been referred back to Dr. Gursky, who had "indicate[d] that there is a medical issue that continues to exist and keep [McNeal] from working." (*Id.*). McNeal noted that she was scheduled to have surgery on July 11, 2014 "to correct what is causing [her] knee and leg to swell," and she accordingly requested the continuation of her short-term benefits. (*Id.*).

MetLife's Medical Director, Dr. John Del Valle then opined that, based on the new symptoms of pain and swelling McNeal had reported, McNeal's physical or medical conditions physically restricted or limited her function, resulting in a functional impairment beyond May 22, 2014. (AR 0041). On July 3, 2014, based on that opinion, the appeals specialist reversed the STD benefits termination, stating the record information supported the conclusion that McNeal was not able to perform the duties of her occupation for the time period under review beyond May 22, 2014. (AR 0044-47, 0051-52, 0494-496). By a letter dated July 11, 2014, MetLife advised McNeal that her STD benefits would be extended an additional two months, through August 27, 2014 (to the maximum of the STD benefits allowed under the policy), and that her file had been referred to a LTD claims specialist. (AR 0492).

6

*MetLife's Initial LTD Decision*

On July 25 2014, MetLife sent a letter to Dr. Gursky requesting more specific information (AR 0451) and conducted a telephone interview with McNeal. McNeal related the history of her knee injury and confirmed that pain and swelling led to a second surgery on July 11, 2014 to clean up scar tissue. McNeal reported that, after the February 27, 2014 knee surgery, she went to physical therapy from March to April, but her doctor told her to stop going due to swelling and pain, and that she had scar tissue build-up. McNeal stated that her left knee and its symptoms were the only problem which prevented her from working. McNeal explained that she felt she was progressing pretty well in her treatment. (AR 0451, 0065-0069).

The LTD claims team decided on July 28, 2014 to obtain information about McNeal's occupational class from a vocational rehabilitation counselor. (AR 0080, 0084). While waiting to receive more information from Dr. Gursky, a MetLife-employed vocational rehabilitation counselor provided the requested occupational information and noted that, under the Dictionary of Occupational Titles (DOT) 045.107-050, a "Clinical Therapist" or "Clinical Counselor" was sedentary work, which involved exerting up to 10 pounds of force occasionally and sitting most of the time, but may involve walking or standing for brief periods. (*See* AR 0085-0086; *see also* DOT 045.107-050).

MetLife received documents from Dr. Gursky on July 31, 2014. (AR 430-435). Dr. Gursky completed the section of the form regarding his "diagnosis and treatment," describing McNeal as having "adhesive capsulitis, left knee," with a "painful left total knee arthroplasty," including symptoms of "pain, decreased mobility, [and] inability to move knee." (AR 433). He described the treatment plan as involving "anti-inflammatories, pain meds, physical therapy, [and] activity only as tolerated." (AR 0434). Gursky left blank the section of the form regarding McNeal's

physical restrictions and limitations, stating that such restrictions and limitations were to be discussed at the next office visit "for possible release to work" August 18, 2014. (*Id.*).

On August 1, 2014, MetLife requested additional medical records from Dr. Gursky, to include copies, covering the time from "from February 22, 2014 through current," of office notes, operative reports, diagnostic test results, rehabilitation or therapy notes, names and dosages of all current medications, treatment plan, next office visit date, and return to work expectations. (AR 0371).

McNeal completed a Personal Profile for MetLife, which MetLife received on August 4, 2014. In it, McNeal described her condition as follows: "Knee pain due to recent surgery, unable to bend it. Pain standing, sitting and laying. Constant pain that limit [sic] my ability to perform work duties." (AR 0395). McNeal also reported that she had difficulty sleeping at night and getting in and out of the tub or shower, but that she was able to complete daily dishwashing and to dust and do laundry on a weekly basis. (AR 0398). She indicated that she has a difficult time pushing a vacuum cleaner and shopping, but was able to attend church two times per week. (AR 0399). She reported that she was driving, did not need assistance, and did not use public transportation. (*See* AR 0398).

On August 25, 2014, MetLife received additional medical records from Dr. Gursky's office, but those documents related only to McNeal's hospital admission and surgery and her discharge from the hospital on March 2, 2014, six months earlier. (AR 0371-0384).

MetLife referred the file to an Independent Physician Consultant, Dr. Leela Rangaswamy, a Board Certified Orthopedic Surgeon, on September 4, 2014, for a full review. MetLife asked Dr. Rangaswamy if the medical information supported functional limitations beyond July 28, 2014, after McNeal's second surgery for debridement. Dr. Rangaswamy submitted her report to MetLife

8

on September 22, 2014, opining that medical records did not support functional limitations beyond July 28, 2014. Based on the records available to MetLife, Dr. Rangaswamy opined that McNeal "would always have permanent restrictions of no squatting, kneeling, creeping, crawling, climbing ladders, pivoting, and twisting her knee because she has had bilateral total knee replacement." (*See* AR 0357-363).

MetLife faxed Dr. Rangaswamy's report to Dr. Gursky and invited comment and / or more information on two occasions: once on September 22, and again on September 30, 2014. (AR 0356). MetLife received additional records from Dr. Gursky on September 26, regarding three visits that took place after the July 2014 debridement surgery. (AR 0335-0346). The first, from an August 18, 2014 visit with Physician's Assistant Thompson, reported that McNeal was still having difficulty with motion. Thompson noted incisions were well-healed and she had active motion of 0-90 and passive motion of 0-100. Thompson noted that he encouraged McNeal to "continue aggressively working on range of motion." She was to follow up in four weeks, with an anticipated return to work. (AR 0338-339).

Physical therapy notes of September 11, 2014 were also provided. Those notes indicated that McNeal's difficulty with knee flexion continued, with an overall pain increase. However, McNeal's treatment for that day included biking for 19 minutes working on knee flexion, leg curls, leg presses, and total gym during the session. (AR 0343). After the session, McNeal reported her pain decreased from the beginning of the session. (*Id.*). The last set of notes were from a September 15, 2014 visit with Thompson. Thompson reported that McNeal was "[d]oing well postoperatively," had no specific complaints, her motion was within expected limits of 0-105 and that McNeal was to return in two months for a follow-up with Dr. Gursky around November 15, 2014. (AR 0335-336).

9

By letter dated October 31, 2014, MetLife notified McNeal that MetLife had decided to deny her LTD claim. MetLife said it denied the claim because the medical information did not provide sufficient evidence that McNeal was unable to perform her job as a licensed mental health therapist. (AR 0312-313). MetLife concluded that her job description entailed providing professional clinical services to Alternative Opportunities DaySpring participant clients, which services included assessments, referrals, treatment planning, counseling, and discharge planning. MetLife noted that her job duties regularly required talking and hearing, using hands to finger, handle or feel frequently, and occasionally standing, walking, sitting, and lifting and/or moving up to 10 pounds. (AR 0312-0314). MetLife noted that it had provided Dr. Rangaswamy's report to Dr. Gursky and attempted numerous times to follow up, but had not received a response to Rangaswamy's report in the month since sending him the report. (*See* AR 0314).

On November 12, 2014, Dr. Gursky sent a letter responding to Dr. Rangaswamy's report. (AR 0298, 0307-0308). Dr. Gursky explained that, following the initial surgery, McNeal made satisfactory achievements in regard to motion and stability, but was "still having significant difficulty" in regard to pain, discomfort, and limitations with ambulatory activities:

> It was deemed at the time in her follow-up period that although she had the functional ability of the knee, that she was still unable to perform her job at a level that would be considered satisfactory or safe, and therefore we continued to keep the patient on limitations, and specifically kept her from returning to work.

(AR 0307). Dr. Gursky's letter did not explain why he was of the opinion in the summer of 2014 that McNeal could not "safely or satisfactorily" perform her job. Gursky also failed to address any other factors that would impact the determination regarding McNeal's ability to return to work under the specific requirements or duties of her job as a counselor. He did not indicate he was even aware of her jobs functions (*see* AR 0307-308), even though MetLife had advised him of the

10

physical duties of her job and asked him to provide medical information as to why she could not perform those duties (*see* AR 0512).

Gursky noted that he believed "that the patient's functional ability has improved, and although she has not been evaluated in the recent past, she is at a point, in my medical opinion, where there is an achievement of her maximum medical improvement in regards to this left knee" and that he "would like to see the patient again and give a formal release back to work." (AR 0308). A MetLife nurse reviewed Dr. Gursky's letter and determined that a "re-review" by the Dane Street physician consultant, Dr. Rangaswamy, was not necessary. (AR 0156).

On November 17, 2014, McNeal saw Dr. Gursky again. At this visit, it was reported that McNeal was able to fully bend the knee and had significant range of motion, but continued to have pain and discomfort and was unable to walk for more than 10-15 minutes without having significant pain. (AR 0288-0289). The knee was stable, but there was slight swelling, some warmth over the incision, and pain beyond 100 degrees of motion. (*Id.*). Dr. Gursky thought McNeal should have tests to rule out any potential loosening and virulent infection, despite no obvious physical signs. (*Id.*). When McNeal saw Dr. Gursky again on November 26, 2014, there was no more swelling in the knee, no warmth, no erythema, and no sign of obvious infection. (AR 0283). McNeal's range of motion was good overall, with full extension. (*Id.*). However, the testing showed a mildly elevated C-RP and sed rate, and Dr. Gursky wrote these could "be associated with just the normal early post-operative changes."[2] (AR 0283-0284). Dr. Gursky wanted to rule out any potential infectious changes. (*Id.*).

---

[2] C-RP and sed rate are both tests used to measure the level of inflammation in the human body.

On December 3, 2014, McNeal met with Dr. Gursky again and he noted that there was some warmth around the knee, but the incision was well healed and she had full extension. Based on testing, however, Dr. Gursky thought a low-level virulent infection may exist in the knee, and he recommended an open debridement of the knee, removal of the first implant, and placement of an antibiotic spacer. (AR 0277-278). Gursky reported that "[t]his certainly eliminated the patient's ability to return to any kind of work duties" and he "would recommend at this point, until further notice, she is to be restricted from work." (AR 0278). Once again, Dr. Gursky did not identify what duties or requirements of McNeal's counseling job she could not perform. (*See id.*).

*Appeal of Denial of LTD Benefits*

On December 3, 2014, McNeal appealed MetLife's denial of her LTD benefits and advised that she was having another surgery because of infection. (AR 0296). MetLife began its analysis of McNeal's appeal and reviewed the file. On December 9, 2014, McNeal underwent a Stage I Arthroplasty excision and revision. The same day, Dr. Gursky's office sent MetLife his most recent medical records and test results. (AR 0274-0293).

On December 30, 2014, MetLife referred McNeal's LTD claim for another file review by a second Board Certified Orthopedic Surgeon, Dr. Peter A. Freedman. (*See* AR 0266-0272; 0183-0191; 0273). After reviewing all of McNeal's files, Dr. Freedman attempted to reach out to Dr. Gursky. Dr. Freedman attempted to teleconference with Dr. Gursky on January 5, 2015, January 6, 2015, and January 7, 2015 but was unable to reach Dr. Gursky each time. Dr. Freedman explained to Dr. Gursky's nurse that he was seeking to clarify McNeal's physical capability and limitations, particularly from mid-April, 2014 through the July 11, 2014 debridement surgery, and again from mid-August 2014 until the revision surgery on December 9, 2014. He explained that,

based on the information that he had, he could not justify finding McNeal unable to do her job during those time-frames.

On January 8, 2015, based on the information provided to him, Dr. Freedman completed his report. In Dr. Freedman's report he marked "Yes" to the question, "Does medical information support functional limitations due to a physical condition or combination of physical conditions from February 27, 2014 continuing through the present date?" However, based on all of the records, Dr. Freedman concluded:

> [A]s of April 10, following the physical therapy discharge (and six weeks post-surgery), Ms. McNeal appears to have had the physical capabilities to sit, stand, walk through an eight hour day, favoring sitting and with the ability to change positions as needed. She could occasionally climb a single standard flight of stairs with a railing. She could twist and bend at the waist. She would have no restrictions related to reaching in any direction or repetitive use of the hands. Records indicate that she was able to drive.

(AR 0266-267).

Dr. Freedman also stated that, after McNeal's second surgery on July 11, 2014, she would have been totally disabled for approximately six weeks but, as of August 19, 2014, she appeared "to once again have had the same physical capabilities which I suggested initially for April 10." (AR 0267). Dr. Freedman acknowledged that, in light of the planned revision arthroplasty and suspected infection, "Ms. McNeal would have been unable to work at all leading up to the December 9, 2014 surgery," and he would expect that to be at least a four month process following reimplantation, rehabilitation with eradication of an infection, if one was found. (AR 0267).

On January 9, 2015, MetLife provided a copy of Dr. Freedman's report to Dr. Gursky and requested any comment by January 23, 2015. (AR 0250). On January 19 or 20, 2015, Dr. Gursky responded. (AR 0244-0248). With respect to McNeal's restrictions following surgery and the low-level infection found in December, Dr. Gursky replied as follows:

13

> It is my opinion that this patient obviously had a low-level virulent infection within the knee during this postoperative period although she continued to try to work through physical therapy and regain her normal activity, the pain, discomfort was always to a point that limited her ability and did not make her able to return to this physical functional job. In light of the most recent findings, it is my opinion that the patient certainly is a candidate and should be considered for long term disability.

(AR 0245).

### *MetLife's Denial of LTD Benefits on Appeal*

By letter dated January 23, 2015, MetLife notified McNeal that it had upheld the denial of her LTD benefits claim. (AR 0240-0243). MetLife discussed the relevant Plan terms, definitions and provisions, McNeal's job description, Dr. Freedman's report, and Dr. Gursky's letters. MetLife noted that Dr. Gursky had not provided sufficient additional clinical evidence or additional medical testing to support any continuous physical, functional limitations that prevented her from performing her counseling job for a continuous period of 180 days, as required by the policy's defined "Elimination Period." (*See* AR 0241). Specifically, MetLife noted Dr. Freedman's conclusions that the medical information on file supported physical functional limitations for the period of February 27 through April 9, 2014, from July 11, 2014 through August 18, 2014, and from December 3, 2014 thereafter. (AR 0241). As a result, McNeal's claim for LTD benefits was not approved. McNeal subsequently filed this ERISA action.

## II.     Standard of Review

The Tenth Circuit has determined that an ERISA claimant does not have a right to jury trial on her claim to recover unpaid benefits. *Adams v. Cyprus Amax Minerals Co.*, 149 F.3d 1156, 1159-61 (10th Cir. 1998); *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1355-56 (10th Cir. 2009). Typically, under the standard of review for ERISA claims, federal courts are limited to the administrative record, consisting of the materials compiled by the administrator in the course

of making the decision. *See Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151, 1157-59 (10th Cir. 2010).

"Principles of trust and law require courts to review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Where a plan grants the administrator discretionary authority to determine eligibility for benefits or to interpret the terms of the plan, the reviewing court must apply an arbitrary-and-capricious standard of review to a plan administrator's actions. *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231-32 (10th Cir. 2012). Here, the parties agree that MetLife had discretionary authority to determine eligibility for and entitlement to benefits. (Doc. 38 at 5, ¶ 5; Doc. 47 at 5 of 40). In reference to MetLife's LTD plan, the contract between MetLife and Alternative provides:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(AR 0660).

Under the arbitrary and capricious standard, the administrator's determination will be upheld "so long as it is predicated on a reasoned basis." *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1357 (10th Cir. 2009). The administrator's decision "need not be the only logical one nor even the best one." *Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)). Instead, the Administrator's decision "will be upheld unless it is not grounded on *any* reasonable basis." *Id*. (quoting *Kimber*, 196 F.3d at 1098). "Indicia of arbitrary and capricious decisions include lack of

substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002). "Substantial evidence" is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker" and "requires more than a scintilla but less than a preponderance." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (internal citations omitted).

When "the entity that administers [a] plan . . . both determines whether an employee is eligible for benefits and pays benefits out of its own pocket . . . this dual role creates a conflict of interest." *Glenn*, 554 U.S. at 108, 112. Such a conflict of interest does not require the district court to shift the burden of proof, but it must "be weighed as a 'factor in determining whether there is an abuse of discretion." *Id*. at 115 (citation omitted). "The significance of the factor will depend upon the circumstances in denying benefits," which will in turn "depend upon the circumstances of the particular case." *Id.* at 108. "The importance [courts] attach to the existence of a conflict of interest is proportionate to the likelihood that the conflict affected the benefits decision." *Graham v. Hartford Life & Accident Ins. C*o., 589 F.3d 1345, 1358 (10th Cir. 2009).

Where there are significant procedural irregularities in the claims review process, *de novo* review may be appropriate. *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151 (10th Cir. 2010); *Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818, 827-28 (10th Cir. 2008). In the absence of consequential procedural irregularities, however, an abuse of discretion / arbitrary and capricious standard of review is applied where the plan gives the administrator discretion to determine eligibility. *See Hart v. Capgemini U.S. LLC Welfare Ben. Plan Admin.*, 547 F. App'x 870, 872-73 (10th Cir. 2013) (unpublished).

**III.    Analysis**

To determine the lawfulness of MetLife's denial of LTD benefits, the Court must "tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117. McNeal argues that several procedural irregularities compel a *de novo* review or a determination that MetLife's decision was arbitrary and capricious.

McNeal first argues that MetLife improperly characterized plaintiff's own occupation as sedentary. She notes that initial claim entries on March 31, 2014 and July 23, 2014 indicated that plaintiff's job class was "light" (*see* A.R. at 0008, 0060), but that MetLife later changed the job class to sedentary. However, throughout MetLife's review of McNeal's file, MetLife utilized the job description provided by plaintiff's employer, Alternative. (*See* A.R. at 0019, 0022, 0028, 0080, 0087, 0103, 0108, 0110, 0118, 0120, 0144, 0147, 0209, 0216, 0665; *see also* A.R. 0548 [Alternative job description]). Moreover, the functional description of the Dictionary of Occupational Titles classification that was referenced by MetLife was consistent with Alternative's job description. There was no procedural irregularity regarding the description of job functions and requirements.

McNeal also asserts that a second procedural irregularity existed in reference to the quality and quantity of evidence that MetLife received from Dr. Gursky. McNeal claims that the information provided to MetLife was sufficient for STD benefits and therefore should have been sufficient for LTD benefits. However, "approval of STD benefits [does] not guarantee approval of LTD benefits." *Rall v. Aetna Life Ins. Co.*, 565 F. App'x 753, 756 (10th Cir. 2014) (unpublished).[3]

---

[3]   While unpublished opinions are not precedential, the *Rall* opinion involved similar arguments and, as such, has persuasive value here. *See* 10th Cir. R. 32.1(A).

Here, MetLife on numerous occasions asked Dr. Gursky and McNeal to provide more detailed information regarding her physical limitations and restrictions. The information that MetLife received regarding McNeal's LTD benefits claim was almost identical to the information it had received for her STD claim. Like in *Rall*, it was reasonable for MetLife to request more detailed information in order to fully and accurately assess her LTD claim. MetLife sent several requests to Dr. Gursky for more detailed information and responses to reports by Drs. Rangaswamy and Freedman, but each time Dr. Gursky responded with vague responses, and did not provide medical documentation to support his opinion that McNeal was unable to return to work. He never addressed her specific limitations in relation to the actual requirements of her job.

McNeal further claims that MetLife provided Dr. Rangaswamy and Dr. Freedman incomplete information regarding her files and therefore their opinions are insufficient grounds to deny her LTD benefits. According to McNeal, Dr. Rangaswamy was provided information that her STD benefits had been denied, but not that MetLife had subsequently re-approved her STD benefits. However, as explained above, approval of short-term benefits does not automatically qualify a person for LTD benefits in any event. Dr. Rangaswamy and Dr. Freedman made medical conclusions based on the medical information that was provided to them.

ERISA does not require that a claims decision-maker accept the opinions of the claimant's treating physician over the opinions of other medical professionals, as long as the opinions relied upon are supported by evidence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), cert. denied, 543 U.S. 815 (2004). "[C]ourts have no warrant to require administrators to automatically accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that

conflicts with a treating physician's evaluation." *Id.* at 834. Here, Drs. Rangaswamy and Freedman made a review of McNeal's file and came to the same conclusions.

Based on the record and having considered the parties' submissions and arguments, the Court finds that MetLife's denial of LTD benefits was made on a reasoned basis and was supported by substantial evidence. According to the LTD plan, McNeal was required to provide "written evidence satisfactory to [MetLife]" that she was continuously unable to perform the duties of her occupation during the 180-day elimination period. (*See* AR 0572). MetLife repeatedly requested medical evidence tying McNeal's knee issues to an inability to do the physical requirements of her job as a clinician during the elimination period, and the evidence was not provided. The medical information included evidence that McNeal progressed and was able to perform personal activities independently, and she was able to drive, go to church, and do household chores. The information Dr. Gursky provided included only his general opinion that McNeal should be considered for LTD benefits, without referencing her actual abilities during the specific, relevant time frames, and he did not address the specific time-frames during which independent physicians concluded Ms. McNeal's medical condition would not prevent her from doing her job duties.

The Court has considered the conflict of interest as a factor, but it does not alter the Court's analysis, because the evidence does not support a finding that there was any likelihood that the "conflict affected the benefits decision." *Graham*, 589 F.3d at 1358. Thus, the Court gives the conflict of interest less weight because MetLife had McNeal's file reviewed independently twice, by two Board Certified Orthopedic Surgeons, both of whom came to similar conclusions that the record was lacking any evidence indicating that McNeal was continuously unable to perform her job duties during the relevant 180-day time frame.

**IV. Conclusion**

For the foregoing reasons, MetLife's decision to deny McNeal LTD benefits was not arbitrary and capricious. That decision is hereby **affirmed**. A separate judgment will be entered forthwith.

ORDERED this 30th day of September, 2019.

_____
JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT